Both attorneys are here. Let's start. May it please the court, my name is Cheryl Myers Booth and I'm here to represent the defendant appellant Ronald Epps. Unless the judges direct me otherwise, I wanted to focus just on count one of the consolidated indictment, the murder wire fraud count. If I could, we argue in our brief that the evidence on that count was legally insufficient. And our contention is, even if this court were to find that it was sufficient, then the trial court still should have considered severing the murder wire fraud count from the six arson mail fraud counts at the trial. Once we had to face the murder charges, which were probably two-thirds of the trial, even though it's only one count in the indictment, and then turn around and have to face the separate arson mail fraud counts, it became overwhelming. And we just didn't think- Where was the prejudice, if there was any? The prejudice, I can tell you that the murder aspect was circumstantial. I mean, we thought we were putting up a pretty good fight against the government's proof on that. The arson was wholly different and prejudiced us in the sense that Mr. Epps had talked to his girlfriend, Tamika Carter, ahead of time. Said, I'm going to commit this arson. My landlord gave me an eviction notice. I had to burn his apartment down. And then I'm going to make a claim for insurance proceeds. And proceeded, not once but twice, to try to burn the apartment. Then made an application for insurance proceeds, and actually was paid on that claim. And the whole time that the government was presenting proof on that, we had just stood in front of the jury on the murder wire fraud and said, oh no, he didn't kill Ms. Moss to get insurance proceeds. And it became, it was really undermined, that argument, solely because the counts were joined. And we had to, in effect, defend a murder and an arson on the same trial. The proof on the arson counts, too, was overwhelming. So, I'm not sure, the point you're arguing now is a point about joinder or a point about sufficiency of evidence? Both, Your Honor. In our brief, we argued that the evidence on the murder wire fraud, specifically on the wire fraud count, which was count one of the consolidated indictment, is legally insufficient. You're saying it's legally insufficient because of failure to prove that he committed the murder for the purpose of doing the wire fraud? That's one of the arguments. But the wire fraud doesn't consist of doing the murder. The wire fraud consists of the false statement to the insurance company that he had no role in the killing of the woman. So, it doesn't matter whether he killed her accidentally or because of, it doesn't matter what reason or how he, the fraud was denying that he had had a role in her death. That was the fraud. It doesn't matter at all whether he did it for the purpose of, whether he did the killing for the purpose of collecting the insurance. Well, it's interesting because in the indictment, the way it's laid out specifically in this case, the government alleged that the murder was part of the scheme to defraud. And there's also a... That may be, but that doesn't make it an essential element of the offense. The government might charge in the indictment, might draft the indictment in a manner that includes a lot of things that might not be proved. But it's only if they're essential elements that it would be insufficient. Well, if we talk about your Honor's comment about the statement by Mr. Epps to the insurance company that he didn't have anything to do with the murder, then I would ask whether or not that was in fact a material misrepresentation. Nobody relied on it. And of course, you know, silence isn't enough usually to carry the day on a wire fraud or scheme to defraud theory. Nobody relied on it. There's absolutely no proof in this record that anybody relied on that statement. In fact, the special investigator from State Farm called Mr. Epps on September 1st, 2009, several days after Ms. Moss' murder. And the same date had talked to the Orchard Park Police Department and had learned that Mr. Epps was in fact a person of interest. So all Mr. Epps said in response to her explanation of the Slayer Rule was, I don't have any information for you, basically. And he never said anything differently. He always said, I don't know anything about the murder. She wasn't relying on that. Absolutely not. She was relying on the Orchard Park Police Department and their investigation and said under Cusick's- If he had said to the insurance company, I murdered her, that they would have paid him the proceeds? Certainly not, because he murdered her. So he wouldn't have been able to benefit from that. What I'm saying is that it wasn't material, anything he said, because no reasonable person was going to rely on his denial of information, the simple denial of information, to make a decision whether to pay or who to pay under that policy. And in fact, on cross-examination of, it was either Eileen Pirates or Jeanine Rubrik, I said specifically, so you weren't going to pay until the Orchard Park Police cleared him of this murder? And they said yes. And in fact, two years and eight months went by, he wasn't cleared by the Orchard Park Police, and then the insurance company brought their interpleader claim, which they certainly could have brought earlier, so that they could walk away from the case and the issue of whether or not Mr. Epps intentionally murdered Ms. Moss could be settled by the court. And that civil case is still pending at this point. The other reason that we thought it was insufficient is because when you look at the cases in our circuit, I know that the government cited Gray, which is a Fourth Circuit case decided 13 years ago. I don't think that's ever been cited by our circuit. Most of the cases in our circuit talk about wire fraud and when a person makes a false statement that causes economic harm to a victim in terms of usually entering into a relationship. So we have cases like I misidentify myself to a bank official, I show them ID showing that I was somebody else in order to induce them to making me a loan. Or I enter into a contract saying I will ship your sewage municipality 100 miles offshore without an intention to do it. So it's usually that type of fraud to get the insurance company to exercise discretion or the victim, not just the insurance company, to exercise discretion to decide what they're going to spend their money on or how to spend their assets. Here, we're looking at the back end. They've already entered into a contract. But in this case, if Moss had not died prematurely, the insurance company would have had use of monies that it no longer has use of, access to, because if it has to pay the insurance policy, right? But I think it's a red herring, Your Honor, because in any insurance contract, the risk is that the person might die. Now here, I agree with you if Mr. Epps would have actually been paid under the policy. But he wasn't. There were secondary beneficiaries which distinguish this case from a case like the Fourth Circuit's decision in Gray because the secondary beneficiaries were innocent and did nothing wrong but still were entitled to be paid for the death of the insured. I mean, if he caused Moss's death, right, then he was essentially trying to get the insurance company to pay something, right? And I'm not sure that that's related. He may have murdered her for personal reasons. He was having an affair, et cetera. And when he applied for the insurance proceeds— There is evidence. Wasn't there a trial that showed that he was very anxious to have Moss change the policy? No, no, no, no. In fact, I want to point out Appendix 166 through 169. If you just look at those few pages, I see my time's up. May I just complete my answer? Yes. Janine Ruebrecht was the insurance adjuster at State Farm who testified as to that. And if you take a look at just those three pages, she said Mr. Epps accompanied Ms. Moss. She does not imply at all that there was duress or coercion because she winds up writing the policy and submitting the paperwork. She said that Mr. Epps indicated they were there to change their beneficiaries, which they were. Ms. Moss had two other nephews she wanted to add to the policy, and that's in fact what she did. That they had both, both Mr. Epps and Ms. Moss, asked about an increase in the policy limit, impliedly because she was adding two more beneficiaries, and that Ruebrecht herself took it upon herself to suggest the conversion from a term life to a universal life, and at page 169 said these were all standard questions that Mr. Epps asked. And then he has no further contact with the insurance company whatsoever. It's solely communication between Ms. Moss and the underwriter and Ms. Moss and the local insurance office. So there's no proof in the case at all that Mr. Epps even knew whether any changes had been made to the policy. Why do you argue that the insurance company didn't rely? Reliance is an essential element generally of a civil cause of action for fraud. Somebody who sues in order to recover because they've been defrauded has to show that they relied. But the definition of fraud in 1341 and 1343 doesn't require any reliance. It simply requires that one have devised a scheme and artifice to defraud and then take further steps. One isn't not guilty of the offense merely because no one has been suckered into reliance on it. True, two-part answer. New York state law, which would govern the Slayer rule under this insurance contract, because it was made in New York, talks about reasonable reliance in terms of the definition under state law. You're correct that a scheme to defraud doesn't require reliance. However, it does require that the misrepresentation be material. In order for it to be material, my point was that it had to be of such a nature that a reasonable person may rely on it. And here, whether he had remained silent or— You acknowledged to me in my prior question that if he had said, please pay me because I'm the beneficiary of her policy and it was me who killed her and I murdered her, he would not have been paid. Well, I said yes because I assume if he made that admission, the police would have arrested him, he'd be prosecuted, and he— It doesn't matter whether the police would arrest him. What matters is that he wouldn't be paid. And so it's material because he would have disqualified himself from being paid. In that instance, Your Honor, I would imagine that if he said that, there would probably be other information available to the special investigator that she also could have relied on, hypothetically, if that were the only thing. And he said, yes, I murdered her. I don't know what the investigator would have done, whether they would have tried to confirm it first or whether they would have simply paid the secondary beneficiaries. I don't know. But I do think, in fairness, I think that if Mr. Epps simply remained silent or said something that is demonstrably not relied on by the insurance company, like in this case where he simply said, I don't have any information for you, I don't know how that can be a material misrepresentation under a scheme to defraud— Did he have information? He said he didn't have information. Did he have information that was pertinent? Well, the jury found him guilty of murder, so yes. My time is up. I thank Your Honors for letting me go over. Good afternoon. May it please the Court. My name is Melissa Marangola, and I represent the government in this case. The government asserts that the judgment of the district court should be affirmed in all respects. I believe the government's brief adequately responded to all of the issues raised by defense counsel, but I'd like to just respond to the issues that were raised today by defense counsel. First, I'll start with joinder of the wire fraud that relates to the murder case and the mail fraud charges that relate to the arsons in this case. It's the government's contention that they were properly joined. As listed in the indictment, this was one ongoing scheme to defraud State Farm Insurance Company. Throughout all of those charges, there's the same victim, being the insurance company, the same motive, which is greed. It was carried out generally through the same manner, by filing false insurance claims. And in addition, many of the witnesses who testified in the trial covered both sets of charges. More than ten witnesses presented from the government would have testified or did testify related to the murder and the arson. They are clearly properly joined, and to require the government to try those separately would simply not make sense from a judicial resource perspective or a practical perspective. It's the government's contention with respect to the sufficiency of the evidence that there was abundant evidence in this case, not only that the defendant murdered Angela Moss, but that he committed wire fraud in attempting to collect on her policy. I think the facts of the trial speak for themselves, and short of questions from the court with respect to sufficiency, I'll rely on the brief. Your adversary, as I understand it, says that he would not have been the primary beneficiary of the policy, but it would have been some nephews. Is that true? Prior to the defendant and Ms. Moss entering the State Farm Insurance Company immediately before July 4th, when they attempted to change the policy, the two nephews were the primary beneficiaries. That was changed as a result of the defendant and Ms. Moss going to State Farm. Now the defendant was the primary beneficiary, and the nephews were the secondary beneficiaries. So he absolutely received a benefit from asking that the policy be changed. Is there any further? I have a question on something slightly related. You talked about the abundance of evidence. In this case, the defendant faced ten counts. These were counts related to a murder-related wire fraud, mail fraud related to arson, arson-related counts, drug trafficking counts, as well as possessing a firearm in connection with drug trafficking. Why is it that it's not substantially prejudicial for the jury, in considering nine of those counts, to also hear before they start deliberating that the defendant has a prior felony conviction? Obviously, it's in the discretion of the court whether or not to bifurcate a felon in possession charge. The government directs the court to consider any prejudice that a stipulated, watered-down acknowledgement to the jury that the defendant had a prior conviction. What, if any, prejudice that would cause, in light of the defendant being charged with murdering his girlfriend and attempting to commit or burn down a house on two separate occasions? It's the government's assertion that the 922G felon in possession count really was arguably the least offensive, the least severe charge that this defendant was accused of committing. I believe that it was appropriate in this case. Again, it was just a stipulation. The word felon, I don't even believe, was mentioned in the stipulation. It simply stated, which was agreed to, I believe by the parties with respect to the language, despite the defendant asking for bifurcation, once the court indicated that he was not going to bifurcate the felony conviction, I believe the language was watered down to the point that it did not have a substantial impact on the jury's verdict in this case. Did the defendant ask to stipulate to the prior conviction so that it would not be presented to the jury? Yes. And that was denied? First, Your Honor, no, we did stipulate. That's what occurred. I did not have to prove it through the use of witnesses. First, the defendant... What I'm asking is whether the defendant asked to stipulate it so that it would not need to be presented to the jury at all, so that he could say, I concede this element so that the jury doesn't need to deliberate on it  I don't believe so, Your Honor, only because I don't believe that's the common practice in the Western District of New York. I'll defer to defense counsel if that was the request, but as my recollection serves, she asked that it be bifurcated so that issue would be presented to the jury after it rendered a verdict on all the remaining counts, including possession of a firearm. And when that was denied, I believe we stipulated to the language addressed by the court. And I understand your point regarding... I believe that your point is that the possession of a firearm in that context may be the least serious of those offenses. What I'm concerned about is talking about the fact that the defendant was previously convicted of a felony in light of the fact that we're asking a jury to presume someone innocent of murder, arson, wire fraud related to this murder, arson related to mail fraud, arson related charges, drug trafficking, and possessing a firearm in connection with drug trafficking. As you've indicated, there's been sorts of evidence before the jury about the defendant having an affair with someone else. I believe being with that person the night that the murder took place. How is the jury supposed to fairly continue to presume that person innocent who's charged with a plethora of different types of crimes when they hear that he has a prior felony conviction? And I understand the court's concern, and that is one that routinely arises when we do charge someone with a 922-G felon in possession charge. It is within the court's discretion, and a limiting instruction, I believe, in this case, because of the other offenses, was sufficient. I acknowledge in other cases, some of which have been cited by defense counsel, such as Tagano, that involve less severe charges. Perhaps a limiting instruction isn't sufficient. But it is within a district court's discretion, and I don't believe that discretion was abused in this case by offering a limiting instruction. You're saying it can never be abused, that it's just that the district court has discretion in whatever the district court decides, a denial of severance or a denial of procedures that would protect the defendant against having the jury consider the prior conviction can never be an abuse of discretion? No, that's not what I'm saying. I'm saying in this case, he did not abuse his discretion. I believe it's a case-by-case basis, and every set of facts at a trial need to be considered independent of each other. What would be a case in which it would be an abuse of discretion? The Jones case that was cited by defense counsel, where the government returned a superseding indictment after a hung jury and added the felon in possession, which this court determined was for, in part, the purpose to advise the jury that he was a felon in the hopes to impact the verdict. This case wouldn't be one. If the government had included the felon in possession charge in the first instance, it then would be within the court's discretion to admit it? I believe so. If the government added it after the hung jury? I believe in that case, that was the focus of the court, and rightfully so. If they would have added it from the beginning, those facts were a little unusual in that there was never a gun found. So that case differs from this, where we actually have the physical weapon and could establish an interstate nexus based on serial numbers and make and model of the weapon. I don't believe in that case, or that case is similar to this case in any respect. And if there is no further inquiry, I will withdraw the rest of my time. Thank you. Thank you. Your Honors, I had reserved one minute for rebuttal. I just want to point out, I think Ms. Marangola misspoke. When Ms. Moss first got the term life insurance policy, she had it in 2006. There were co-primary beneficiaries on that policy. Mr. Epps would have received 40%, and her nephew, Trevante Johnson, would have received 60%, but they were co-primary beneficiaries. So when Ms. Rubecht at State Farm talked to Ms. Moss about converting the term insurance policy to a universal life, Mr. Epps was already a primary beneficiary, and the discussion was about him remaining as a primary beneficiary and adding two additional nephews. And I can't come up with their names off the top of my head. His portion of the life insurance policy would go up, right? It would. The amount that he would receive would go up substantially. Correct. And you asked Ms. Marangola whether he would now have a benefit. He would, in fact, have an increased benefit under the universal life policy because even though he's still a primary beneficiary, he went from $40,000 that he would have gotten to getting the full $100,000 under the policy. The policy amount stayed the same both times. So I just wanted to make sure that we were clear on that. Unless there's any other questions, I'll rely on my brief. Thank you both for your arguments.  Thank you, Your Honors.